# IN THE SUPREME COURT OF IOWA

No. 10–1454

Filed January 20, 2012

**STATE OF IOWA,**

Appellant,

vs.

**ROBERT DALE LOWE, JR.,**

Appellee.

Appeal from the Iowa District Court for Polk County, D.J. Stovall, Judge (July 20, 2010 suppression ruling) and Joel D. Novak, Judge (August 30, 2010 suppression ruling).

The Supreme Court granted the parties' cross-applications for discretionary review of the district court's grant and denial of the motions to suppress. **DECISION OF THE DISTRICT COURT AFFIRMED ON APPEAL; DECISION OF THE DISTRICT COURT AFFIRMED ON CROSS-APPEAL AND CASE REMANDED.**

Thomas J. Miller, Attorney General, Elisabeth S. Reynoldson, Assistant Attorney General, John P. Sarcone, County Attorney, and Daniel C. Voogt, Assistant County Attorney, for appellant.

Nicholas A. Sarcone and Dean A. Stowers of Stowers Law Firm, West Des Moines, for appellee.

**ZAGER, Justice**.

The State appeals an adverse ruling on a motion which suppressed statements made by the defendant, Robert Lowe, as having been made in response to a promise of leniency, thereby rendering them involuntary. Lowe cross-appeals, claiming the district court erred in overruling his motion to suppress his statements as a violation of *Miranda* and, more specifically, as a violation of the ban on questioning a defendant after that defendant has invoked his right to counsel. Lowe further claims the district court erred in not suppressing all evidence found at the scene because the consent that led to the search of the premises was only obtained by prior police illegality. Lowe also claims that the consent to search provided by Cody Audsley was not voluntary and that he—Lowe— was removed from the area to prevent him from objecting to any search, in violation of the Fourth Amendment. We hold that the search was proper and that the motion to suppress the physical evidence obtained as a result of the search was properly denied. We further hold that because there was not sufficient exigency to justify the police reinitiating questioning of Lowe following Lowe's request for counsel, the public safety exception to *Miranda* does not apply under the facts of this case, and therefore, Lowe's statements were properly suppressed.

## I. Background Facts and Proceedings.

At 10:00 p.m. on April 6, 2010, dispatch informed Detective Corey Schneden of the Ankeny Police Department that a female (Cindy) was being treated in the emergency room of a local hospital for a drug overdose. Schneden was advised the female likely ingested the drugs at Cody Audsley's residence, a mobile home in Ankeny. Schneden went to Audsley's residence for the purpose of interviewing her. He was accompanied by Officers Webb and Ripperger, both of whom were in

uniform. Schneden was not in uniform, but was wearing a police department T-shirt, as well as a badge and gun.

Upon arrival, Schneden approached the main entrance on the south side of the mobile home. Ripperger was directly behind Schneden, and Webb was on a gravel drive east of and adjacent to Audsley's mobile home. Webb went to the east side of the mobile home to prevent anyone from fleeing when Schneden knocked on the door. Webb was standing on a gravel driveway between Audsley's mobile home and another mobile home and was about a foot away from a window with a partially open blind which was broken or bent. When Schneden knocked on the door, Webb observed Audsley retrieve something from the kitchen table and place it in a kitchen cabinet. Webb also observed Lowe run towards the back of the residence and out of view. At this point, Webb went to the yard on the north side of the residence to determine whether Lowe had fled.

After Schneden knocked on the door, he identified himself as a police officer. Schneden asked for, and received, Audsley's permission to enter the residence. As he entered, he introduced Ripperger and asked if they could ask Audsley a few questions. Audsley agreed. At this point, Webb was advised that both residents were now in the living area, so Webb joined Schneden and Ripperger in the residence. Audsley never gave Webb explicit permission to enter, but never asked him to leave. At no point did Audsley ask the officers to leave.

After entering, the police encountered Lowe and asked him to identify himself. Lowe produced identification and stated he lived with his mother elsewhere in Ankeny. He specifically denied that he lived at Audsley's residence. However, Lowe also stated that he was staying at Audsley's and that he was a guest. Later on in the evening, Lowe was

allowed to change from gym shorts into sweatpants. Officers later found male clothing in a bedroom of the mobile home.

In response to questioning, Audsley denied using drugs with Cindy that day. During this initial questioning, Audsley was repeatedly reminded of the very serious medical condition Cindy was facing and was also confronted with Webb's observation of Audsley grabbing something from the table and placing it in the kitchen cabinet. During this time, officers asked her at least three times for consent to search the residence. While she did not expressly deny consent the first two times, she said no on the third occasion. At that point, Schneden asked Lowe to step outside with him to talk out of Audsley's presence. Schneden was outside with Lowe for only a few minutes. He asked Lowe if he knew what drugs Cindy might have taken earlier that day and explained that Cindy was in need of medical treatment and that the officers needed to know what she might have taken. According to Schneden, Lowe was free to leave at any time. Lowe denied having knowledge of any drugs Cindy might have taken.

While Schneden and Lowe were outside, Ripperger and Webb continued their questioning of Audsley. Webb told Audsley that the officers needed to know what Cindy had taken and that Cindy's life might be in danger if Audsley did not tell them what she knew. Audsley then responded, "We smoked weed together. Do you want it?" At that point, Ripperger asked Audsley where the marijuana was, and Audsley pointed to a Del Monte fruit can on the coffee table. Around this time, Schneden and Lowe reentered the residence, and Ripperger told Schneden that Audsley admitted smoking marijuana earlier in the day with Cindy and that there was marijuana hidden in the fruit can on the table. With Audsley's permission, Webb picked the fruit can up. He then asked

Audsley for consent to open it, which he received. After unscrewing a false bottom on the can, Webb found a pipe and marijuana. Once the marijuana was discovered, Audsley and Lowe were not free to leave. Audsley then refused to consent to a search of the rest of the residence.

Around midnight on April 6, 2010, Schneden contacted Detective Matthew Jenkins, a member of the Ankeny Police Department assigned to the Mid-Iowa Narcotics Task Force, to assist in obtaining a search warrant for Audsley's mobile home. The probable cause for the search warrant was the discovery of the marijuana and drug paraphernalia.[1] The police did not begin searching the residence until 3:00 a.m. when Jenkins arrived with the search warrant. At that time, Lowe and Audsley were inside the residence and neither was in handcuffs. Jenkins provided each of them with the *Miranda* warning. While Audsley agreed to speak with Jenkins, Lowe immediately requested to speak with counsel. Lowe was then placed in a squad car. Audsley remained in the mobile home during the search.

Sometime during the search, Schneden entered the bathroom area and found what he believed to be components of a meth lab. This was not an active meth lab, and none of the officers reported smelling any odors associated with methamphetamine production. After being advised of this discovery, Jenkins became concerned for the safety of his officers and the neighbors. He spoke to Audsley, who confirmed that Lowe had been involved in manufacturing methamphetamine in the past, but it was not to be made in the residence. Officers were told to suspend their

---

[1]The record does not contain the application for the search warrant or the search warrant itself. However, both Lowe and the State agree that the marijuana and drug paraphernalia found as a result of the consensual search formed the basis for the search warrant.

search until Jenkins could speak to Lowe about whether there was anything dangerous in the residence.

Jenkins then went back to the squad car, opened the door, and reiterated to Lowe that he did not have to speak with him, that he was "not asking to get you [Lowe] in trouble," but that he did not want to find any anhydrous. Lowe confirmed that there was nothing active going on at that time, but Lowe stated that there was an empty anhydrous tank in the shed and that it was his, not Audsley's.

On May 4, 2010, Lowe and Audsley were charged with conspiracy to manufacture a controlled substance, manufacturing a controlled substance, possession of anhydrous ammonia with intent to manufacture a controlled substance, and possession of lithium with intent to manufacture a controlled substance. Lowe moved to suppress his statements to police, alleging the statements were elicited in violation of his rights under the Fifth Amendment of the United States Constitution and article I, section 9 of the Iowa Constitution when Jenkins reinitiated questioning after Lowe invoked his right to counsel. After an evidentiary hearing, the district court denied the motion, finding that Jenkins reinitiated questioning out of a concern for officer safety and that such questioning was proper under a public safety exception to *Miranda.*

Lowe filed another motion to suppress on June 17, alleging the search warrant for Audsley's mobile home was based on information obtained by a prior illegal search in violation of the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution. After an additional evidentiary hearing, the district court overruled Lowe's second motion, finding Audsley's consent was freely and voluntarily given and there was no evidence of coercion in the record.

The next day, Lowe moved to enlarge the findings and rulings, claiming the court insufficiently supported its findings and did not rule on all the issues before it, namely whether Audsley's consent was induced by a prior illegal search. The motion to enlarge the findings and rulings was overruled by the motion judge. A motion to reconsider this ruling was brought before the trial judge who also denied it. Further motions on the issues involving the search and seizure of physical evidence were also denied.

On July 7, Lowe filed a renewed motion to suppress his statements and asked the court to reopen the record based on newly received recordings of his conversation with Jenkins. This motion additionally argued the statements should be suppressed as a promise of leniency under *State v. McCoy*, 692 N.W.2d 6 (Iowa 2005). Lowe argued his delay in asserting his claim of promissory leniency was based on the State's failure to deliver the audio recordings of his exchange with Jenkins in a timely fashion.

In its resistance to the motion, the State argued the statements were not barred as a *Miranda* violation based on the public safety exception. The State also argued Lowe's July 7 motion was untimely because it was not brought within forty days of arraignment, as required under Iowa Rule of Criminal Procedure 2.11(4), and any delay in Lowe receiving the recordings of his conversation with Jenkins was irrelevant because Lowe had a duty to disclose these facts to his attorney. After a hearing, the district court ruled that Jenkins was concerned for the safety of himself and others, so the public safety exception to *Miranda* would apply. However, the court ruled Jenkins's statement, "I'm not asking to get you in trouble," was a promise of leniency that Lowe would receive some benefit for his response and that led Lowe "to believe that if

he answered the detective's questions he could do so without fear of his answers being used against him." Accordingly, the district court granted Lowe's motion to suppress the statements made to Jenkins as a promise of leniency.

The State sought discretionary review of the ruling on the suppression of Lowe's statements, and Lowe filed a cross-application for discretionary review of the rulings of the district court regarding the search and seizure of physical evidence. We now consider the merits of each party's arguments.

## II. Standard of Review.

Lowe claims that the search was conducted without Audsley's valid consent, that the search was conducted without his consent, and that these actions violate the state and federal constitutions. Lowe also claims the police reinitiated questioning of him after he invoked his right to counsel. Our review of constitutional issues is de novo. *State v. Lane*, 726 N.W.2d 371, 377 (Iowa 2007); *see also State v. Palmer*, 791 N.W.2d 840, 844 (Iowa 2010) (holding we review de novo a district court's decision to admit statements allegedly obtained in violation of the accused's constitutional rights). This review requires us to make an independent evaluation of the totality of the circumstances as shown by the entire record, including the evidence presented at the suppression hearings. *Id.* Because of the district court's opportunity to evaluate the credibility of witnesses, we will give deference to the factual findings of the district court, but we are not bound by them. *Id.*

Lowe argues the evidence against him should be suppressed under both the state and federal constitutions. However, "we generally decline to consider an independent state constitutional standard based upon a mere citation to the applicable state constitutional provision." *State v.*

*Effler*, 769 N.W.2d 880, 895 (Iowa 2009) (Appel, J., specially concurring).[2]

### III. **The Physical Evidence Obtained in the Home and Shed.**

Lowe claims that the physical evidence found in Audsley's mobile home—the marijuana, pipe, and the precursor substances—must be suppressed because the evidence was obtained in violation of the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution. Though neither party provided the search warrant application to aid in our review, both parties agree, and the district court found, that the marijuana formed the basis for the search warrant. Therefore, if Audsley's consent was invalid based on either the exploitation of a prior illegal search or seizure, or because Audsley's consent was not voluntary, then there is no other basis for the warrant in the record, and the physical evidence obtained pursuant to that search warrant must be suppressed.

Lowe also points to *Georgia v. Randolph*, 547 U.S. 103, 126 S. Ct. 1515, 164 L. Ed. 2d 208 (2006), and claims that under *Randolph*, the police were required to obtain his consent in order to use the evidence against him. Because they did not obtain his consent, Lowe argues that the marijuana and any evidence recovered pursuant to the search warrant predicated on the discovery of the marijuana cannot be used against him.

Lowe claims that Audsley's consent was invalid. The Supreme Court has stated that "Fourth Amendment rights are personal rights

---

[2]On appeal, Lowe only makes the argument that the Iowa Constitution should be interpreted differently than the United States Constitution when he claims the police should have been required to obtain his consent before searching the fruit can. Therefore, unless we indicate otherwise, we assume for the purposes of this appeal that the United States Constitution and the Iowa Constitution should be interpreted in an identical fashion. *State v. Wilkes*, 756 N.W.2d 838, 842 n.1 (Iowa 2008).

which . . . may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 133–34, 99 S. Ct. 421, 425, 58 L. Ed. 2d 387, 394 (1978) (citation and internal quotation marks omitted); *see also State v. Naujoks*, 637 N.W.2d 101, 106 ("The right afforded by the Fourth Amendment is specific to the individual and may not be invoked by third persons."). In order to object to the evidence on constitutional grounds, Lowe must show that his own constitutional rights, under either the state or federal constitutions, have been violated. If he can show that his rights have been violated, then "[w]e are not inclined to require defendant to make an independent showing of standing." *State v. Henderson*, 313 N.W.2d 564, 565 (Iowa 1981); *see also Minnesota v. Carter*, 525 U.S. 83, 87–88, 119 S. Ct. 469, 472, 142 L. Ed. 2d 373, 379 (1998) (noting that the "standing" doctrine was rejected in *Rakas* and "in order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable"). Lowe's ability "to assert a Fourth Amendment violation will stand or fall on [his] ability to show a substantive violation which in turn is based on a showing of a legitimate expectation of privacy in the particular area searched or the particular objects seized." *Henderson*, 313 N.W.2d at 565 (citing *Rakas*, 439 U.S. at 148, 99 S. Ct. at 432, 58 L. Ed. 2d at 404).[3]

We employ a two-step approach to determine whether there has been a violation of the Fourth Amendment or article I, section 8 of the Iowa Constitution. *State v. Fleming*, 790 N.W.2d 560, 564 (Iowa 2010); *see also Naujoks*, 637 N.W.2d at 106; *State v. Halliburton*, 539 N.W.2d

---

[3]We note that it is not necessary for a defendant to make an independent showing of standing because "[t]he standing issue inheres in the [determination of a legitimate expectation of privacy]." *State v. Eis*, 348 N.W.2d 224, 226 (Iowa 1984).

339, 342 (Iowa 1995); *State v. Eis*, 348 N.W.2d 224, 226 (Iowa 1984). To satisfy the first step, an individual challenging the legality of a search has the burden of showing a legitimate expectation of privacy in the area searched. *Fleming*, 790 N.W.2d at 564.

> The determination of whether a person has a legitimate expectation of privacy with respect to a certain area is made on a case-by-case basis, considering the unique facts of each particular situation. The expectation must also be one that society considers reasonable.

*Id.* (citations and internal quotation marks omitted). Therefore, as a preliminary matter, we must determine whether Lowe had a reasonable expectation of privacy in Audsley's mobile home. An expectation of privacy must be subjectively and objectively legitimate and will be determined "on a case-by-case basis." *Naujoks*, 637 N.W.2d at 106. An overnight guest has a legitimate expectation of privacy in his host's home. *Id.* Leaving possessions in another's residence and making frequent visits are also factors that favor a legitimate expectation of privacy. *State v. Lovig*, 675 N.W.2d 557, 564 (Iowa 2004).

Although Lowe denied living at Audsley's residence when the officers first entered, it appeared to the officers that Lowe was a guest of Audsley's. Lowe had clothes and other items of a personal nature in Audsley's mobile home. Additionally, according to the minutes of testimony, Lowe had been staying there for about six months. Based on these unique subjective and objective facts, we conclude Lowe had a legitimate expectation of privacy in Audsley's mobile home.

Since Lowe has shown a legitimate expectation of privacy in Audsley's mobile home, we must move to step two of the analysis in which we must decide whether the State unreasonably invaded the protected interest. *Fleming*, 790 N.W.2d at 564; *see also Naujoks*, 637

N.W.2d at 106. "Warrantless searches are per se unreasonable if they do not fall within one of the well-recognized exceptions to the warrant requirement." *Naujoks*, 637 N.W.2d at 107. Consent searches are one of these exceptions. *Id.* To be valid, consent must be voluntary. *See State v. Reinier*, 628 N.W.2d 460, 465 (Iowa 2001).

The officers did not have a warrant when they first approached Audsley's residence, but they received Audsley's consent to enter the mobile home and ultimately to search the fruit can. Lowe claims that Audsley's consent was the exploitation of prior police illegality, making it "fruit of the poisonous tree." *See Lane*, 726 N.W.2d at 383. Lowe also claims Audsley's consent was not voluntary. If either of these claims is accurate, then Audsley did not validly consent to the search of the fruit can. The State has not provided any basis other than Audsley's consent to justify the search. If Audsley's consent was involuntarily obtained, then the police would have unreasonably searched her residence which, as stated above, is an area where Lowe had a legitimate expectation of privacy. We now turn to Lowe's challenges to Audsley's consent.

**A. Was Audsley's Consent to Search the Result of Prior Police Illegality?** Around 11:00 p.m., Webb received consent to search what appeared to be a can of Del Monte fruit cocktail that was sitting in Audsley's living room. The fruit can contained a false bottom which held marijuana and a pipe. The State asserts Audsley voluntarily consented to the search. Lowe does not dispute that Audsley told the officers they could search the fruit can. Lowe asserts that Audsley's consent was only produced by exploiting prior police illegality, that her consent was not voluntary, and that even if it were, the evidence is still inadmissible against Lowe because he did not consent to the search.

Lowe points to two actions he claims constitute illegal searches and seizures prior to the consensual search of the fruit can. First, he claims the police searched the mobile home illegally when Webb looked in the windows prior to the officers knocking at the door. Second, he claims the police seized Audsley and him without reasonable suspicion prior to the discovery of the marijuana when they exceeded the scope of Audsley's consent to a knock and talk and "took over" the mobile home.

1. *The activities of the police prior to entering the mobile home.* We turn first to Lowe's contention that Webb searched the mobile home by looking in the windows. A person in his dwelling with the window coverings almost closed certainly has some expectation of privacy. *State v. Davis*, 228 N.W.2d 67, 72 (Iowa 1975), *overruled on other grounds by State v. Hanes*, 790 N.W.2d 545, 550 & n.1 (Iowa 2010). However, a search only occurs if there is a violation of an expectation of privacy "that society considers reasonable." *State v. Breuer*, 577 N.W.2d 41, 46 (Iowa 1998). Regarding driveways, we have noted that "[i]t is common for solicitors, operators of motor vehicles, and other individuals to enter unsecured driveways of private residences." *State v. Lewis*, 675 N.W.2d 516, 523 (Iowa 2004). Therefore, a defendant "could not have had a reasonable expectation of privacy in his driveway" and the Fourth Amendment would not prevent the police from entering it. *Id.*; *see also State v. Dickerson*, 313 N.W.2d 526, 531–32 (Iowa 1981).

Webb looked through Audsley's windows while he was standing on the driveway of her mobile home. We have distinguished between merely looking into a protected area from a public vantage point and making observations with the naked eye—which is not a search—and actually entering the protected area without the consent of the owner and conducting a warrantless search. *See Lewis*, 675 N.W.2d at 523–24.

The police are free to observe areas they may not constitutionally enter without a warrant or some other recognized exception to the warrant requirement. *See id.* Officers entering areas that are open to the public do not wear a blindfold. *Dickerson*, 313 N.W.2d at 531. So long as officers make their observations from a location where they have a right to be, they have "a right to see what [is] visible from that position." *Id.* at 532; *see also Lewis*, 675 N.W.2d at 523 ("[T]here is no legitimate expectation of privacy and no search within the meaning of the Fourth Amendment when authorities can view an activity occurring in the curtilage from a public area.").

In applying these legal principles to the facts of this case, we must analyze the significance of Webb's location when he observed Audsley place something in the kitchen cabinet and saw Lowe run to the back of the mobile home. Lowe claims that this observation constituted an illegal search and that it was later exploited to gain Audsley's consent. Webb testified that he was outside the east window of the mobile home when he saw Audsley put something in the cabinet, that he was standing on the gravel drive on the east side of the house when this occurred, and that the blind was partially open so that he could readily see into the residence. As Audsley was placing something in the cabinet, Webb observed Lowe run to the back of the residence. It was only at that point that Webb entered the backyard. We need not determine whether entering the backyard was an invasion of a legitimate expectation of privacy because Webb did not confront Audsley or Lowe with any observations he made from that vantage point. Lowe's claim is that confronting Audsley with the fact that Webb had seen her put something in the cabinet was an exploitation of prior police illegality. We disagree. When Webb observed Audsley in the kitchen, he was standing on the

gravel driveway on the east side of the mobile home. This was a public vantage point where the officer had a right to be, and an observation made with the naked eye from that point is not a search. *Lewis*, 675 N.W.2d at 523. Since these observations were not illegal searches, confronting Audsley with them could not be the exploitation of a prior illegal search.

2. *The officers' alleged seizure of Lowe and Audsley after entering the mobile home.* Lowe contends that the police detained both Audsley and him without reasonable suspicion and in violation of his Fourth Amendment rights and that this detention was exploited to gain Audsley's later consent to search. As a preliminary matter, we note that ordinarily, a defendant cannot challenge the seizure of another person. 6 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 11.3, at 129 (4th ed. 2004) [hereinafter LaFave] ("As for seizure of a *person,* it is clear that one person lacks standing to object to the seizure of another."). This is because "a defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that *his* Fourth Amendment rights were violated by the challenged search or seizure." *United States v. Padilla*, 508 U.S. 77, 81, 113 S. Ct. 1936, 1939, 123 L. Ed. 2d 635, 640 (1993). The mere seizure of another person would not, ordinarily, violate the Fourth Amendment rights of a third party. In this case, however, Lowe alleges that Audsley was improperly seized and that prior illegal seizure was exploited to gain her consent to search the fruit can. Lowe is therefore permitted to challenge the seizure of Audsley because, if Audsley was illegally seized and that seizure was exploited to gain her consent, then her consent would be fruit of the poisonous tree, making it invalid. If her consent was invalid, then the police would have

unreasonably searched an area where Lowe had a legitimate expectation of privacy, therein violating his rights under the state and federal constitutions.[4]

"Whether a 'seizure' occurred is determined by the totality of the circumstances." *State v. Wilkes*, 756 N.W.2d 838, 842 (Iowa 2008). "The Supreme Court has long recognized that not all police contacts with individuals are deemed seizures within the meaning of the Fourth Amendment." *State v. Smith*, 683 N.W.2d 542, 546 (Iowa 2004) (citation and internal quotation marks omitted). Encounters with the police remain consensual "[s]o long as a reasonable person would feel free to disregard the police and go about his business." *Id.* at 547 (citation and internal quotation marks omitted). Generally, police questioning, and the responses it elicits, does not constitute a seizure. *Wilkes*, 756 N.W.2d at 843; *State v. Reinders*, 690 N.W.2d 78, 82 (Iowa 2004).

For a seizure to occur, there must be "objective indices of police coercion." *Wilkes*, 756 N.W.2d at 843. The fact that an officer shows a badge, is "visibly armed," or is in uniform has been given little weight in the analysis. *See id.* at 843. In order to maintain the consensual nature of the encounter, there should be "no show of authority, no intimidation, and no use of physical force by the officers in their encounter." *Reinders*, 690 N.W.2d at 83. Other signs of a seizure would be "evidence the [officer] used a commanding or threatening tone, displayed a weapon, or touched [the suspect]." *Smith*, 683 N.W.2d at 547. In sum, we must determine whether the officers impaired Audsley's ability to control her

---

[4]From this point on, we will only deal with the alleged seizure of Audsley. Lowe never consented to the search of the fruit can, making it impossible for the police to exploit a seizure of Lowe to gain his consent.

own residence or whether the "officers simply engaged [her] in conversation." *Reinders*, 690 N.W.2d at 83.

When the officers arrived at Audsley's residence, Schneden identified himself as a police officer and asked for permission to enter in order to question Audsley regarding a woman who had overdosed on drugs. Audsley specifically consented to Schneden and Ripperger's entry, and she never objected to Webb entering immediately thereafter. Audsley implicitly consented to Webb's entry. Audsley refused to consent to a search of her entire residence, but never asked the officers to leave. The only instruction Audsley ever gave the officers—that they did not have permission to search her entire residence—was followed.

Schneden characterized his interaction with Lowe and Audsley as "conducting an interview." During the course of that interview, Schneden took down Audsley's information, recorded Lowe's information from his identification card, and asked for both of their phone numbers, which they provided without objection. During the course of the interview, Audsley willingly shared her interactions with Cindy during the day. Schneden then asked questions about her relationship with Cindy. He also informed Audsley that Cindy stated that she had consumed something she had gotten from Audsley earlier that day. Audsley denied that she had given Cindy anything illegal, but there is no evidence that the officers were lying about the statements Cindy made at the hospital or her current medical condition. Audsley admitted that she knew Cindy smoked marijuana, repeatedly denied giving Cindy anything, and denied having any drugs in the mobile home. She did not allow the officers to search because she felt there was no reason to. Webb then confronted Audsley with his observations that she hid something when the officers knocked on the door. When Audsley denied putting

something in the cabinet, Webb stated, "Don't lie to me, 'cause I was standing right there at the window and watched you do it."

At that point, Lowe was asked to go outside with Schneden to answer a few questions about his interactions with Cindy. While Lowe and Schneden were outside, Webb and Ripperger continued to question Audsley. Audsley denied putting anything in the cabinet, and Webb asked why she was lying to him. Webb or Ripperger told Audsley, "The thing is, I don't give a shit about arresting you; I don't give a shit about charging you," but that the doctors needed to know what Cindy took or "she may die from it." One of the officers reminded Audsley that Cindy indicated she got something from Audsley earlier that day. At that point, Audsley stated, "We smoked weed together. Do you want it?" Lowe and Schneden then reentered the mobile home. At this point, Audsley gave Webb permission to pick up and open the fruit can containing the marijuana and drug paraphernalia. Schneden asked if the substance was only marijuana, and Audsley confirmed that it was. Audsley then refused to consent to a search of her entire residence. Webb and Schneden continued to try to find out if Audsley knew what else Cindy had taken, in addition to smoking marijuana, and Webb emphasized the danger that Cindy was in. However, these questions occurred after Audsley consented to the search of the fruit can, and therefore, they would not impact the validity of the consent that Audsley had already given.

During this encounter, all three officers were armed and had badges, and two were in uniform. The officers never drew their weapons or touched Audsley, and they did not threaten her with arrest. The officers questioned Audsley regarding the overdose, and repeatedly reminded her that if she were not forthcoming with any information she

had, it could lead to further health problems for Cindy. There is no evidence in the record that this claim was false. While the officers may have raised their voices, they did not use threats, intimidation, or physical force in such a way that would have impaired Audsley's ability to control her own residence. There were no "commands" to Audsley that she was required to tell the officers what they wanted to know, only requests for information. There were no commands to Lowe that would give Audsley the impression she had been seized. Schneden asked Lowe to step outside with him, and Lowe willingly did so. There is no evidence either Lowe or Audsley expressed any objection to Schneden's request to talk to Lowe outside Audsley's presence.[5]

After reviewing the totality of the circumstances, we determine that Audsley was not "seized" or detained in violation of the Fourth Amendment. Audsley allowed the police into her home and voluntarily answered their questions. She willingly discussed her interactions with Cindy throughout the day and allowed Schneden to read text messages off of her phone. The officers were, as one might suspect, armed and wearing badges and uniforms. This does not transform a consensual encounter with the police into a detention. Audsley never asked the police to leave, and the one limit she placed on police activity inside her home—that the officers not search the entire residence—was respected until the officers obtained a search warrant.[6] Under the facts of this

---

[5]We also note that, despite the claims in his brief, Lowe was not directed where to sit and officers did not accompany him while he changed into sweatpants, until *after* the marijuana was discovered. These actions, therefore, could not have led Audsley to feel as though she had been "seized" by the police prior to her consent to search.

[6]Lowe's motion to suppress sought to exclude evidence obtained not only after consent to search was obtained, but also after police illegality. We have stated the following:

"When a claim of consensual search is preceded by illegal police action . . ., the government must not only show the voluntariness of the

case, we cannot conclude that there was any prior illegal police action leading up to the consent obtained from Audsley.

**B. Was Audsley's Consent to Search Voluntary?** A warrantless search conducted by free and voluntary consent does not violate the Fourth Amendment. *Reinier,* 628 N.W.2d at 465 (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S. Ct. 2041, 2043–44, 36 L. Ed. 2d 854, 858 (1973)). Consent is considered to be voluntary when it is given without duress or coercion, either express or implied. *See Schneckloth,* 412 U.S. at 227, 93 S. Ct. at 2048, 36 L. Ed. 2d at 863. This test balances the competing interests of legitimate and effective police practices against our society's deep fundamental belief that the criminal law cannot be used unfairly. *See id.* at 224–25, 93 S. Ct. at 2046–47, 36 L. Ed. 2d at 861. Thus, the concept of voluntariness which emerges as the test for consent represents a fair accommodation of these interests and values. *See id.* at 229, 93 S. Ct. at 2048–49, 36 L. Ed. 2d at 864. The State has the burden to prove the consent was voluntary, and voluntariness is a " 'question of fact to be determined from the totality of all the circumstances.' " *Lane,* 726 N.W.2d at 378 (quoting *Schneckloth,* 412 U.S. at 227, 93 S. Ct. at 2048, 36 L. Ed. 2d at 862). "The State is required to establish the consent was voluntary by a preponderance of the evidence." *Reinier,* 628 N.W.2d at 465.

---

subsequent consent under the totality of the circumstances, but must also establish a break in the illegal action and the evidence subsequently obtained under the so-called "fruit of the poisonous tree" doctrine.

. . . Thus, there are two issues to analyze in a consent-to-search case such as this: (1) voluntariness under the totality of the circumstances, and (2) exploitation under the fruit of the poisonous tree doctrine."

*State v. Lane,* 726 N.W.2d 371, 377 (Iowa 2007) (citations omitted). The two concepts are not the same. However, because we conclude that no prior illegal police action has been established, we will focus on whether the consent was voluntary.

The question of voluntariness requires the consideration of many factors, although no one factor itself may be determinative. *See generally* 4 LaFave, § 8.2, at 50–141 (discussing several factors bearing upon the validity of consent). In determining whether consent is voluntary, courts examine the totality of the circumstances, including relevant factors such as:

> "(1) the individual's age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of [her] *Miranda* rights; and (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals. It is also important to consider the environment in which an individual's consent is obtained, including (1) the length of the detention; (2) whether the police used threats, physical intimidation, or punishment to extract consent; (3) whether police made promises or misrepresentations; (4) whether the individual was in custody or under arrest when consent was given; (5) whether consent was given in a public or in a secluded location; and (6) whether the individual stood by silently or objected to the search."

*United States v. Golinveaux*, 611 F.3d 956, 959 (8th Cir. 2010) (citation omitted).

There are several additional factors this court can consider when determining whether consent is valid. "[L]imitations on the nature of the crime under investigation and the objects sought by the search" can minimize the seriousness of possessing drugs for personal use and may subtly create a belief that there will be no consequences if the occupants consent to a search. *Reinier*, 628 N.W.2d at 469. "These comments by police constitute a subtle form of deception with no reasonable basis." *Id.* However, a suspect acknowledging there are drugs in the house— thereby giving the officer probable cause to obtain a search warrant— supports the contention that consent was voluntarily obtained. *Id.*; *see also* 4 LaFave § 8.2(g), at 100. The court can also consider "knowledge

by the defendant of the right to refuse to consent . . . [and] whether police asserted any claim of authority to search prior to obtaining consent." *Reinier*, 628 N.W.2d at 465 (citations omitted).

Audsley's consent was obtained after a "knock and talk" encounter with the officers. The "knock and talk" procedure generally

> involves officers knocking on the door of a house, identifying themselves as officers, asking to talk to the occupant about a criminal matter, and eventually requesting permission to search the house. If successful, it allows police officers who lack probable cause to gain access to a house and conduct a search.
>
> The "knock and talk" procedure has generally been upheld as a consensual encounter and a valid means to request consent to search a house.

*Id.* at 466 (citations omitted). The State carries the burden of proving there was valid consent both to enter the home and to conduct the search. *Id.* at 467. The consent of officers to enter the mobile home in this case is not reasonably in dispute.

Turning to our analysis of the relevant factors relating to Audsley's consent, Audsley voluntarily allowed multiple police officers into her home. She was twenty-eight years old, and there is nothing in the record to show that she suffered from any mental abnormality or was otherwise impaired by alcohol or drugs. The encounter with the police took place "on the familiar surroundings of the threshold of [Audsley's] home." *See State v. Pals*, 805 N.W.2d 767, 782 (Iowa 2011). Also, Audsley clearly knew she had the right to refuse consent to search because at all times she refused to consent to a search of her entire mobile home.[7]

---

[7]Though both parties presented evidence and made arguments regarding the voluntariness of Audsley's consent to search, neither party presented evidence on the "knowing" and voluntary nature of her consent (requiring law enforcement to advise her of her right to refuse consent to search). Audsley did not testify at the suppression hearings. There is no direct evidence of her knowledge of her right to refuse consent to a search. This is not surprising considering Lowe only claims that Audsley's consent

Although Audsley admitted smoking marijuana earlier that day, there was no evidence she was too impaired to consent, and her discussions with the officers do not indicate the contrary. The officers were at Audsley's residence because Cindy, her friend, was at the hospital suffering from an overdose. Cindy had not told the doctors what she took that day, but had indicated that, whatever the substance was, she got it from Audsley. The officers reminded Audsley that if the doctors knew everything that Cindy had taken, the doctors could treat her more quickly. At that point, Audsley admitted she had been smoking marijuana with her friend Cindy earlier that day and then asked the officer, "Do you want it?" The officers then requested and received consent to take possession of the fruit can and received further consent to open the fruit can. Audsley did not testify at the suppression hearing. Therefore, it is impossible to know whether Audsley admitted smoking marijuana and allowed the police to examine it in order to help the police determine what Cindy took in order to save Cindy's life, or whether she only consented to a search because her will had been overborne by the officers.[8] Though a close question, we believe, based on the behavior of the officers and the circumstances of the consent given, the former is a more accurate portrayal of Audsley's consent than the latter.

The questioning of Audsley was of a short duration, perhaps twenty minutes. There is no evidence of threats or physical intimidation.

_____

was involuntary, not that it was given without the knowledge she could refuse. Moreover, Lowe has not asked this court to adopt a knowing and voluntary requirement under article I, section 8 of the Iowa Constitution. Without a full development of the legal and factual arguments on this issue, we decline to adopt a new standard regarding consent in this case.

[8]It is certainly possible that Audsley would risk being charged with a minor drug possession offense in an effort to help the police determine what was causing her friend's health problems.

The record does not disclose that the officers made any misrepresentations regarding Cindy's medical condition in order to obtain Audsley's consent to search the fruit can.[9] The police never claimed they could search without Audsley's consent. While officers did ask for consent several times before the limited consent was granted, this is just one of the factors which the court can rely on in determining whether the ultimate search was voluntary. *See United States v. Cedano-Medina*, 366 F.3d 682, 688 (8th Cir. 2004) ("[T]here is certainly no legal rule that asking more than once for permission to search renders a suspect's consent involuntary, particularly where the suspect's initial response is ambiguous." (citation and internal quotation marks omitted)); *see also* 4 LaFave § 8.2(f), at 97–100. Although we acknowledge prior unreasonable searches can also be a factor in this analysis, we have already concluded there was no prior misconduct by the police.

There are also factors that weigh against the voluntariness of Audsley's consent. One of the officers told Audsley, "The thing is, I don't give a shit about arresting you; I don't give a shit about charging you," and that the doctors needed to know what Cindy took or "she might die from it." These statements are troubling. In *Reinier*, we noted:

> The officers told Reinier prior to obtaining her consent that they were not looking for small quantities of drugs but "meth labs" and "major dealers." These comments bear upon the voluntariness of the consent because they are limitations on the nature of the crime under investigation and the objects sought by the search. The comments also tend to minimize the seriousness of possessing drugs for personal use or casual sales, and subtly create a false belief that no adverse consequences will result from a search if there is no meth lab in the house and the occupants are not

---

[9]The officers repeatedly reminded Audsley of Cindy's medical condition as a way of pressuring her to tell them what she knew. However, there is nothing in the record to indicate that these claims were inaccurate.

major dealers.  These comments by police constitute a subtle
form of deception with no reasonable basis.

*Reinier*, 628 N.W.2d at 469 (citations omitted).  Unlike in *Reinier*, the officer made it clear that he was looking for small amounts of drugs that would be used for personal use or casual sales.  In that respect, he did not "subtly create a false belief that no adverse consequences will result from a search if there is no meth lab in the house and the occupants are not major dealers." *Id.*

He did, however, tell Audsley that he was not interested in charging her.  The officers indicated early on that they were interested in searching the entire premises in order to determine what drugs Cindy might have taken.  This officer's comment, much like the officer's comment in *Reinier*, "tend[ed] to minimize the seriousness of possessing drugs for personal use or casual sales." *Id.*  As such, it was a "subtle form of deception." *Id.*  However, the subtle use of deception to gain consent to search is only one factor among many when evaluating the totality of the circumstances to determine whether consent is voluntary. *Id.*  We will therefore consider Webb's statement as one of many factors in our analysis.[10]

---

[10]Lowe has not claimed that the officer's statement was a promise of leniency or that such a promise might render Audsley's consent involuntary, regardless of other factors.  Instead, Lowe makes a generalized attack under the totality of the circumstances.  Accordingly, we have limited our analysis to the challenges actually made by Lowe.

This approach is consistent with our past cases.  *Reinier* treated a statement that minimized the consequences of possessing small amounts of drugs as one factor in the analysis of whether consent to search was voluntary.  On other occasions, we have held that *statements* made in response to a promise of leniency are per se inadmissible. *See State v. Kase*, 344 N.W.2d 223, 225–26 (Iowa 1984).  Evidence improperly obtained in violation of the Fourth Amendment is excluded from the trial under the exclusionary rule in an effort to deter police misconduct, "to provide a remedy for a constitutional violation[,] and to protect the integrity of the judiciary." *Lane*, 726 N.W.2d at 392; *see also State v. Cline*, 617 N.W.2d 277, 289 (Iowa 2000), *abrogated on other grounds by State v. Turner*, 630 N.W.2d 601, 606 n.2 (Iowa 2001).  On the other hand, "[s]tatements exacted by promissory leniency are not excluded on prophylactic grounds to deter police

While presenting a close case, in our review of the totality of the circumstances, we conclude that Audsley's consent to search the can of fruit was voluntary.[11]

We now turn to the issue of whether Audsley's consent to search the fruit can is binding on Lowe.

**C. The Impact of Audsley's Consent on Lowe.** We have long held that a guest without exclusive possession of an area assumes the risk that his host will allow others into the common areas. *State v. Knutson*, 234 N.W.2d 105, 107 (Iowa 1975). Additionally, a cohabitant assumes the risk that other cohabitants will consent to searches of shared living areas. *Id.* (citing *United States v. Matlock*, 415 U.S. 164, 171, 94 S. Ct. 988, 993, 39 L. Ed. 2d 242, 249–50 (1974)). If a person with authority grants consent to search shared areas, that authority is binding as to all other people who share the area. *State v. Bakker*, 262 N.W.2d 538, 546 (Iowa 1978).

Authority to consent includes not only actual, but also apparent, authority. *Illinois v. Rodriguez*, 497 U.S. 177, 185–87, 110 S. Ct. 2793, 2799–2801, 111 L. Ed. 2d 148, 159–60 (1990). Apparent authority will

_____

misconduct; they are excluded on grounds that statements exacted under such circumstances are unreliable." *Kase*, 344 N.W.2d at 226. When a statement is made in response to a promise of leniency, the statement's "probative value, if any exists, is substantially outweighed by the danger of confusion of issues and would be misleading to the jury under Iowa rule of evidence 403." *State v. McCoy*, 692 N.W.2d 6, 28 (Iowa 2005) (citation and internal quotation marks omitted). When reviewing a suspect's consent to search the totality-of-the-circumstances test is used, and under that test, whether an officer has minimized the seriousness of possessing drugs is one factor among many that the court must consider.

[11]We recently decided the case of *State v. Pals*, 805 N.W.2d 767 (Iowa 2011). While on its face it may appear that the decision we make today is inconsistent with our decision in *Pals*, the cases are clearly distinguishable. *Pals* involved the "inherently coercive" setting of a traffic stop where "Pals found himself seized in the front seat of a squad car with his own vehicle parked on the side of the public highway." *Id.* at 782–83. We noted the difference between a request for consent during a traffic stop and "an encounter on the familiar surroundings of the threshold of one's home." *Id.* at 782.

validate a search where officials "enter without a warrant because they reasonably (though erroneously) believe that the person who has consented to their entry" had the authority to do so. *Id.* at 186, 110 S. Ct. at 2800, 111 L. Ed. 2d at 160. We apply an objective standard when analyzing consent and ask "would the facts available to the officer at the moment . . . warrant a [person] of reasonable caution in the belief that the consenting party had authority over the premises?" *Id.* at 188, 110 S. Ct. at 2801, 111 L. Ed. 2d at 161 (citations and internal quotation marks omitted) (alteration in original).

The United States Supreme Court has recently announced a narrow exception to the rule that a cotenant's consent is binding on other cotenants. Under the Fourth Amendment, "a physically present co-occupant's stated refusal to permit entry prevails, rendering the warrantless search unreasonable and invalid as to him." *Randolph*, 547 U.S. at 106, 126 S. Ct. at 1519, 164 L. Ed. 2d at 217. Even under this rule, however, the police can only accord "dispositive weight to the fellow occupant's contrary indication *when he expresses it.*" *Id.* at 121–22, 126 S. Ct. at 1527, 164 L. Ed. 2d at 227 (emphasis added). The only possible way in which a co-occupant could successfully invoke this protection without being physically present and objecting would be if the police have "removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection." *Id.* at 121, 126 S. Ct. at 1527, 164 L. Ed. 2d at 226–27.

Audsley owned the mobile home where police initially obtained her consent to enter. Additionally, the fruit can with the marijuana was found in the common area of the mobile home sitting out on the table. Not surprisingly, Lowe has not claimed that he was the exclusive owner of the fruit can. Since the fruit can was located in the living room of her

home, Audsley had the actual and apparent authority to consent to a search of it. There is no claim that any part of the mobile home was exclusively Lowe's. Therefore, any areas of the mobile home where Lowe could claim an expectation of privacy would be shared areas, and he would have to expect Audsley could consent to searches of those areas. *Cf. Fleming*, 790 N.W.2d at 565–67. Most importantly, despite being present in the mobile home for all but a few minutes, Lowe never objected to the entry by the police or the search of the fruit can. Further, the record evidence in this case does not support a conclusion that Lowe was removed from the premises for the improper purpose of his possible objection to the entry by officers or the search of the fruit can. Lowe was not "removed" by the police. He was asked to step outside, which he willingly did. The police did not ask for consent to pick up or open the fruit can until after Lowe had reentered the residence.

Lowe asks for a more expansive definition of "physically present" in the *Randolph* analysis under the Iowa Constitution. A more expansive definition would not change our analysis. Lowe's claim under *Randolph* fails because he failed to object, not because he was not "present."

Lowe also asks this court to declare that article I, section 8 of the Iowa Constitution requires the police obtain affirmative consent from all physically present cotenants, as opposed to merely honoring their affirmative objections. *Randolph* does not require this affirmative step. In *Randolph,* the Court acknowledged "it is fair to say that a caller standing at the door of shared premises would have no confidence that one occupant's invitation was a sufficiently good reason to enter when a fellow tenant stood there saying, 'stay out.'" *Randolph,* 547 U.S. at 113, 126 S. Ct. at 1522–23, 164 L. Ed. 2d at 221. The police should also be required to follow this social norm:

> Since the co-tenant wishing to open the door to a third party has no recognized authority in law or social practice to prevail over a present and objecting co-tenant, his disputed invitation, without more, gives a police officer no better claim to reasonableness in entering than the officer would have in the absence of any consent at all.

*Id.* at 114, 126 S. Ct. at 1523, 164 L. Ed. 2d at 222.

The Supreme Court clearly noted it would only "afford[] dispositive weight to the fellow occupant's contrary indication when he expresses it." *Id.* at 121–22, 126 S. Ct. at 1527, 164 L. Ed. 2d at 227. The reason for requiring a cotenant to actually voice his objection was that an alternative rule "requir[ing] the police to take affirmative steps to find a potentially objecting co-tenant before acting on the permission they had already received" would "needlessly limit the capacity of the police to respond to ostensibly legitimate opportunities in the field." *Id.* Lowe has not provided us with any reason to interpret the Iowa Constitution any differently. Just as the United States Supreme Court refused to require the police to find every potential cotenant who may wish to object to the search and obtain their consent, we will not require the police to obtain the affirmative assent of every present cotenant prior to conducting a search.

Nothing in this record would support the conclusion that Lowe was removed from the premises to prevent him from objecting to the search. Audsley had the authority to consent to the entry by police and the limited search of the fruit can on the coffee table. Lowe was physically present at the time, but did not object to the entry by police or the search of the fruit can. Because Lowe did not object, Audsley's consent to search is valid as to Lowe, and allowing the evidence found to be used against him does not violate Lowe's rights under either the federal or state constitutions.

**D. Conclusion.** Audsley validly consented to a search of a common area in the mobile home she owned. The record evidence in this case does not support the conclusion Lowe was removed by the police to prevent his objection to the search. Lowe never objected to the search even though he was physically present when the consent to search the fruit can was given. The search of the fruit can with the false bottom was valid.

Lowe also attempts to attack the search warrant that led to the discovery of the other physical evidence the State seeks to use against him. This is based on the claim that the marijuana which formed the probable cause for the search warrant was the product of illegal police action or involuntary consent. The parties agree, and the district court found, that the marijuana found as a result of that search did in fact supply the probable cause that supported the warrant application. Since the consent that led to the discovery of the marijuana was not based on any prior illegal police action, and Audsley's consent was voluntary, any attack on the search warrant is without merit. The warrant was properly obtained, and therefore the physical evidence seized as a result of that warrant is admissible against Lowe.

**IV. Lowe's Statements to Jenkins Following Lowe's Request for an Attorney.**

Upon his arrival with the search warrant, Jenkins read Audsley and Lowe their *Miranda* warnings. Lowe immediately requested an attorney, and he was placed in a squad car while the search of the residence continued. Once officers discovered what they believed to be components of a meth lab in the bathroom, Jenkins approached Lowe and asked if there was any anhydrous ammonia or other dangerous substances on the property. In response to the State's arguments on

discretionary review regarding the promise of leniency issue, Lowe contends this reinitiation of questioning violated his Fifth Amendment right to counsel.[12] The State does not dispute that Lowe was subjected to a custodial interrogation or that Lowe had affirmatively invoked his right to counsel, when Jenkins began to question Lowe regarding the presence of anhydrous ammonia on the property. The State contends Jenkins's questions fall under the public safety exception to the *Miranda* warnings.

After receiving the *Miranda* warnings, a suspect may waive his rights and respond to interrogation, or a suspect can request counsel. *Edwards v. Arizona*, 451 U.S. 477, 484, 101 S. Ct. 1880, 1884, 68 L. Ed. 2d 378, 385 (1981). "Under the Federal Constitution, the authorities must follow different procedural safeguards to re-interrogate a suspect depending on whether the suspect has invoked his or her right to remain silent or the right to the presence of counsel." *Palmer*, 791 N.W.2d at 848. In *Edwards*, the Court established a clear, bright-line rule: If the suspect requests counsel, all interrogation must cease until the detainee is provided with an attorney or "the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 484–85, 101 S. Ct. at 1885, 68 L. Ed. 2d at 386; *see also*

---

[12]The State claims the issue of the *Miranda* violation is not properly before the court because Lowe did not file a cross-application for discretionary review of the district court's determination that the public safety exception was applicable in this case. The district court ultimately suppressed the statements based on the promissory leniency argument. We have stated that "we will uphold a ruling of the court on the admissibility of evidence on any ground appearing in the record, whether urged below or not." *State v. McCowen*, 297 N.W.2d 226, 227 (Iowa 1980); *see also State v. Parker*, 747 N.W.2d 196, 208 (Iowa 2008). In this case, the issue was actually argued in front of the district court, which heard testimony from the officers at the scene regarding the potential dangers facing the officers and the reasons for reinitiating interrogation. The record contains more than sufficient evidence for us to rule on the public-safety-exception issue, and it is properly before us.

*Palmer,* 791 N.W.2d at 848 ("[T]he Court in *Edwards* adopted a per se ban on any further questioning of a suspect without the presence of counsel, for an indefinite duration, after the suspect invokes the right to counsel."). The Court reasoned that invoking the right to counsel is a "significant event" and once an accused has requested an attorney, he has an " 'undisputed right' under Miranda to remain silent and to be free of interrogation." *Edwards*, 451 U.S. at 485, 101 S. Ct. at 1885, 68 L. Ed. 2d at 386–87 (citation omitted).

The State does not dispute that Lowe requested an attorney. Instead, the State seeks to extend the "public safety exception" to the *Miranda* requirements to situations like the one here, where the accused has requested an attorney and the police subsequently reinitiate questioning. We have not previously decided whether the public safety exception applies after the *Miranda* protections have been invoked.

The public safety exception to the *Miranda* warnings was first announced in *New York v. Quarles*, 467 U.S. 649, 104 S. Ct. 2626, 81 L. Ed. 2d 550 (1984), and has since been adopted in Iowa. *See State v. Deases*, 518 N.W.2d 784, 791 (Iowa 1994). Under the public safety exception, when "police officers ask questions reasonably prompted by a concern for the public safety," without first giving suspects *Miranda* warnings, the responses those questions elicit do not violate *Miranda*. *Quarles*, 467 U.S. at 656, 104 S. Ct. at 2631–32, 81 L. Ed. 2d at 557. The justification given for the rule is straightforward: "[T]he need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Id.* at 657, 104 S. Ct. at 2632, 81 L. Ed. 2d at 558. In ordinary interrogations, the Court reasoned, *Miranda* warnings are procedural safeguards which make a

suspect less likely to divulge information, and their primary "social cost" is fewer convictions. *Id.* at 656–57, 104 S. Ct. at 2632, 81 L. Ed. 2d at 557. In the public safety situation, however, "the cost would have been something more than merely the failure to obtain evidence." *Id.* at 657, 104 S. Ct. at 2632, 81 L. Ed. 2d at 558. The cost in these situations would be increasing the risk of harm to the public. *Id.*

We have noted that the public safety exception is closely drawn and narrow in scope. *In re J.D.F.*, 553 N.W.2d 585, 588 (Iowa 1996); *see also Quarles*, 467 U.S. at 658, 104 S. Ct. at 2632, 81 L. Ed. 2d at 558. For the exception to apply, there must be a threat to public safety and an "immediate necessity" for the information the officer seeks to obtain by questioning a suspect in violation of *Miranda*. *Quarles*, 467 U.S. at 657, 104 S. Ct. at 2632, 81 L. Ed. 2d at 557. The exception will only apply in situations where there is "sufficient exigency to justify the questioning." *In re J.D.F.*, 553 N.W.2d at 588. A missing gun in a field creates "sufficient exigency" to justify pre-*Miranda* questioning. *Id.* at 587–88. The exception also applies to the discovery of an active methamphetamine lab. *State v. Simmons*, 714 N.W.2d 264, 275 (Iowa 2006).

In *Simmons*, officers could smell anhydrous ammonia from outside the door of an apartment. *Id.* at 269. After requesting permission to enter the apartment and receiving no response, officers forced the door open. *Id.* Once the door was open, the smell of anhydrous ammonia was strong enough to make one officer's eyes water. *Id.* Without reciting *Miranda* warnings, the officers asked the defendant whether there was an active meth lab in the apartment, and the defendant said there was. *Id.* at 269–70. The officers then evacuated the residents of the apartment

across the hall, immediately called dispatch, and did not reenter the area without protective gear. *Id.* at 270. We held

> [the officer's] inquiries as to the presence and status of a methamphetamine lab were for the purpose of obtaining information that would help him safely address the potentially volatile and dangerous situation confronting the officers at the scene, and not solely to obtain incriminating information from [the defendant].

*Id.* at 275. Particularly, we noted the strong odor of anhydrous ammonia in the apartment. *Id.* The odor itself posed a safety risk to the officers and the neighbors, and that risk justified the officers' failure to recite the *Miranda* warnings prior to questioning the defendant about the presence and nature of a meth lab. *Id.* These circumstances demonstrated sufficient exigency for the public safety exception to apply.

In this case, the officers had been in Audsley's mobile home for nearly five hours before officers found inactive components of a meth lab and Jenkins reinitiated questioning of Lowe. During that time, the officers did not report any odor of anhydrous ammonia or ether, nor did they report any physical effects such as watering eyes. Jenkins only reinitiated questioning after components of a meth lab were discovered, but he did not order the other officers out of the mobile home or evacuate the surrounding residences. Jenkins testified that there was material in one of the bedrooms that smelled of anhydrous ammonia, but this material had not been located at the time Jenkins reinitiated questioning. Jenkins also testified Lowe told him that he was not actively manufacturing methamphetamine in the mobile home at the time of the search. Audsley confirmed that Lowe had manufactured methamphetamine in the past, but she had told him he could not do it in the house. The only basis for the reinitiation of interrogation was the discovery of the inactive components of a meth lab in the bathroom.

The discovery of inactive components of a meth lab does not provide sufficient exigency to justify a public safety exception to the requirements of *Miranda* and its progeny. Unlike the officers in *Simmons*, where the exception was applicable, Jenkins was not confronted with an active methamphetamine lab. None of the officers in Audsley's mobile home reported any odors of anhydrous ammonia or ether. There was no evidence that the active "cooking" of meth was taking place. Additionally, Jenkins did not feel the threat was severe enough to evacuate Audsley and his fellow officers, or to warn nearby residents and remove them from the potentially dangerous area. Under these facts, we cannot conclude there was sufficient exigency for the public safety exception to apply.

Once a suspect requests an attorney, all interrogation must cease. *Edwards*, 451 U.S. at 484–85, 101 S. Ct. at 1885, 68 L. Ed. 2d at 386–87; *see also Palmer*, 791 N.W.2d at 847–48. Jenkins reinitiated questioning prior to Lowe speaking with an attorney. Because the State has not shown sufficient exigency to invoke the public safety exception, the statements made by Lowe after he requested counsel were taken in violation of *Miranda* and *Edwards*. Because there was insufficient exigency to invoke the public safety exception in this case, we need not determine whether the public safety exception could ever apply in a situation where the suspect had already requested an attorney. Under the facts and circumstances of this case, and based upon our prior precedent, we hold that there is insufficient exigency to justify the officer's departure from the *Miranda* requirements. Since the statements are suppressed on this basis, we need not address the issue of promissory leniency.

## V. Disposition.

The police did not violate Lowe's federal or state constitutional rights when they searched the fruit can on the coffee table in Audsley's living room. Audsley's consent was not the result of prior illegal police action and therefore the evidence is not "fruit of the poisonous tree," nor was her consent involuntary under the totality of the circumstances that existed in this case. Additionally, despite being physically present, Lowe never objected to the entry of the police or the search of the fruit can. As such, the trial court was correct in denying the motion to suppress the physical evidence obtained pursuant to the consent and the search warrant. Also, when the police reinitiated questioning of Lowe after he requested an attorney, they violated his constitutional rights under *Miranda.* Accordingly, those statements were properly suppressed. On discretionary review from the district court's ruling granting the motion to suppress the statements, the ruling on the motion to suppress is affirmed. On cross-application for discretionary review, the district court's ruling denying the motion to suppress the physical evidence obtained based on the alleged violation of the United States and Iowa Constitutions is affirmed.

**DECISION OF THE DISTRICT COURT AFFIRMED ON APPEAL; DECISION OF THE DISTRICT COURT AFFIRMED ON CROSS-APPEAL AND CASE REMANDED.**

Cady, C.J., concurs; Appel, Wiggins, and Hecht, JJ., concur in part and dissent in part; and Waterman and Mansfield, JJ., concur specially.

**WATERMAN, Justice (concurring specially).**

I concur in the result and in all aspects of the well-reasoned majority opinion, except for its blessing of the language in *State v. Pals*, 805 N.W.2d 767, 783 (Iowa 2011), characterizing traffic stops as an "inherently coercive" setting for determining whether a citizen's consent to the search of his vehicle is voluntary. *Pals* was wrongly decided for the reasons set forth in my dissenting opinion in that case. *See Pals*, 805 N.W.2d at 788 (Waterman, J., dissenting) (noting the " 'temporary and relatively nonthreatening detention involved in a traffic stop' " (quoting *Maryland v. Shatzer*, 599 U.S. ___, ___, 130 S. Ct. 1213, 1224, 175 L. Ed. 2d 1045, 1058 (2010))). Today's majority correctly applies our precedent and Federal Fourth Amendment precedent to uphold Audsley's consent to search as voluntary.

I would like to respond to my dissenting colleagues. The dissent thinks it "indisputable" that *Howard*, *Reinier*, and *Randolph*, "collectively," require invalidation of the consent search under article I, section 8 of the Iowa Constitution. This is surprising because none of those cases was decided under a separate analysis of Iowa constitutional law.[13]

Moreover, each of those cases is distinguishable. In *State v. Howard*, the officer told the defendant that "he was only interested in retrieving the [stolen] property and that if Howard turned it over to the authorities, he would not be prosecuted." 509 N.W.2d 764, 766 (Iowa 1993). That is quite different from the circumstances surrounding

---

[13]*Reinier* invalidated the search under both the Fourth Amendment and the Iowa Constitution, but its analysis was based on Fourth Amendment precedent and there was no separate consideration of the Iowa Constitution. *State v. Reinier*, 628 N.W.2d 460, 464, 469 (Iowa 2001).

Audsley's consent to search. No promise of leniency was made to her. *State v. Reinier* is closer to being on point, as the majority opinion acknowledges, but is still readily distinguishable because the police both "asserted authority to search" and engaged in "deception with no reasonable basis." 628 N.W.2d 460, 468–69 (Iowa 2001). Here, neither of those factors is present. The police did not state or imply they could search without consent; rather, they asked Audsley whether they could search, and she initially told them no, but later handed them the Del Monte fruit can with the marijuana and pipe. There is also no indication any misrepresentation was made to Audsley. To the contrary, no one disputed the officer told Audsley the truth when he said her friend (who Audsley admitted smoked marijuana with her earlier that day) was in a medical emergency due to a drug overdose. Finally, *Georgia v. Randolph* draws a "line" that the consent of the only cotenant who is present is valid "[s]o long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection." 547 U.S. 103, 121, 126 S. Ct. 1515, 1527, 164 L. Ed. 2d 208, 226–27 (2006). As the majority notes and the dissent does not dispute, there is nothing in the record to suggest the police removed Lowe to forestall his objection to a search.

In short, I do not think *Howard, Reinier,* and *Randolph* can be fairly read, even "collectively," to require invalidation of the initial search in this case. As in *Pals,* the problem here is not that the existing Fourth Amendment search and seizure precedents are unclear. The problem is that members of this court believe those precedents lead to an unjust result and therefore want to chart a different path under the Iowa Constitution.

The dissent then moves to its real point, which is that we should adopt a rule under the Iowa Constitution requiring police to advise occupants of their right to refuse a search. The dissent claims this would provide a "much clearer rule." I have my doubts. The dissent's proposed rule works only in one direction: If the advice was not given, then the search is invalid. If it was given, the search could still be invalid if the consent is shown to be involuntary for some other reason. *See Reinier,* 628 N.W.2d at 469 (consent found to be involuntary based on police conduct and statements even though defendant read and signed written consent form). I am not sure the dissent's one-way rule provides much clarity. To the contrary, the dissent's seductive allure of promised new clarity in determining the validity of residential consent searches must be weighed against the significant uncertainty inevitably resulting from the break with Iowa and federal search and seizure precedent and the lack of clarity over how far the new advance warning requirement would be extended in future cases.

Yet another problem with the dissent's approach is its disconnect from the present case. In the dissent's view, a consent to search is automatically "involuntary" unless the person was told he or she had a right to refuse the search. But in this case, Audsley unquestionably *knew* she had that right. She indicated to the police she would not consent to a search of her premises; those requests were consistently honored. She did at one point retrieve the fruit can, hand it to the police, and agree that they could open it; but there is no doubt on this record she knew she had the right not to do so. She then refused to consent to a broader search of the premises. If the search here is to be deemed "involuntary," the reason cannot be Audsley's ignorance of her legal

rights. Thus, the dissent would construct a rule to address an issue that is not even presented by this case.[14]

In any event, I would be very hesitant to throw aside decades of precedent and create another discrepancy between Fourth Amendment law and how the identically worded article I, section 8 of the Iowa Constitution is interpreted. *See Reinier,* 628 N.W.2d at 464 (stating that the "same fundamental right of privacy is found" in the Fourth Amendment and article I, section 8 of the Iowa Constitution). The dissent says that consent forms are practical to use and would not significantly affect law enforcement. It would be nice if law enforcement could weigh in on this subject.[15] They could if the consent requirement were adopted legislatively, rather than as a new-found interpretation of the Iowa Constitution. Because we are talking about changing the law to make it more "practical," this strikes me as an argument that should be directed in the first instance to the legislature. The dissent cites *Welch v. Iowa Department of Transportation,* but it is important to recognize that *Welch* involved adherence to a long-standing bright-line rule of statutory interpretation, as opposed to overturning long-standing constitutional precedent. 801 N.W.2d 590, 592 (Iowa 2011). And merely because prior warnings on written consent forms offer benefits and are currently in use by some law enforcement agencies does not mean we should reinterpret our state constitution to require them hereafter.

---

[14]The dissent accuses me of trying to send a "message" that repeated police pressure on a person who initially refuses a search but ultimately succumbs to the pressure renders the search valid. Not at all. All I am saying is (a) the pressure in this case was not such as to render Audsley's consent involuntary, and (b) it makes no sense to adopt a new rule requiring police to tell persons they have a right to refuse a search in a case in which the individual's knowledge of that right was not at issue.

[15]Here, not even *the parties* have weighed in on the subject because no one argued here—or below—for the mandatory warning approach proposed by the dissent.

The dissent presents no persuasive reason to overturn our own precedent under both the Fourth Amendment and article I, section 8 of the Iowa Constitution holding prior warnings are not required for consent searches. *See State v. Reinders*, 690 N.W.2d 78, 82 (Iowa 2004) ("An individual's response [to police requests to search] is considered consensual, even though the person has not been advised that he is free to refuse to respond." (citing *United States v. Drayton,* 536 U.S. 194, 203, 122 S. Ct. 2105, 2112, 153 L. Ed. 2d 242, 253 (2002))). The only caselaw cited by the dissent in support of its proposed sea change in search and seizure law are the decisions of just four other state supreme courts. Those decisions are outliers.

The overwhelming majority of state appellate courts analyzing consent search issues on independent state constitutional grounds follows the federal approach and rejects a requirement that police advise suspects they can decline requests for permission to search. *See, e.g., State v. Flores,* 185 P.3d 1067, 1071 (N.M. Ct. App. 2008) ("Every other state court that has been asked to adopt the *Ferrier* rule as a matter of state constitutional law has rejected it.") (collecting knock-and-talk cases); *Commonwealth v. Cleckley,* 738 A.2d 427, 432 (Pa. 1999) ("Those states that have addressed this issue, however, have, for the most part, rejected the notion that knowledge of one's right to refuse consent to a warrantless search is required under the applicable state constitution, opting instead to follow the federal voluntariness standard which focuses on the totality of the circumstances as opposed to any one factor.") (collecting other cases).

The dissent fails to note that the leading case of its minority of four, *State v. Ferrier,* was expressly based on a unique state constitutional provision stating, "No person shall be disturbed in his

private affairs, or his home invaded, without authority of law." 960 P.2d 927, 930 (Wash. 1998) (quoting Wash. Const. art. I, § 7). As the *Ferrier* court confirmed, "This provision differs from the Fourth Amendment in that, '[u]nlike the Fourth Amendment, Const. art. I, § 7 "clearly recognizes an individual's right to privacy with *no* express limitations." ' " *Id.* (quoting *State v. Young*, 867 P.2d 593, 596 (Wash. 1994)). By contrast, the Iowa search and seizure provision and the Fourth Amendment are worded identically.

Nevertheless, a sharply divided Arkansas Supreme Court relied on *Ferrier* in adopting a warning requirement under its state constitution in *State v. Brown*. 156 S.W.3d 722, 731 (Ark. 2004). The dissenting opinion begins, "Today, a 4–3 divided court issues an opinion that makes a radical change in Arkansas search and seizure law. The decision is clearly contrary to prior law and the change is totally unwarranted and unnecessary." *Id.* at 732 (Glaze, J., dissenting). Justice Glaze's observation would be equally true for Iowa if today's dissent had one more vote in this case.

My colleagues' dissent cites "values underlying article I, section 8," but those values are the same values that underlie the Fourth Amendment and all other state constitutional search and seizure provisions. None of those values are new; none of the dissent's arguments are new. Do today's dissenters understand those values better than the Justices of the United States Supreme Court, the justices of the great majority of state supreme courts, and our own predecessors on this court who have declined to hold that a consent to search is automatically invalid unless the individual was expressly told he or she had a right to refuse consent? Where others have looked at the same

"values" for so long and generally come to a different conclusion, I would be hesitant to substitute my assessment of "values" so quickly.

Notwithstanding the dissent's references to "special protection of the home," the dissent also implies that its requirement of a prior warning of a right to refuse should apply to vehicle searches. The dissent criticizes the reasoning in the *Pals* majority opinion that one of the dissenters wrote just three months ago. And logically speaking, there is no reason why the dissent's requirement of a prior warning should not apply to searches of the *person*. Or, for that matter, to noncustodial interrogations that yield confessions which in the dissent's new world would be inadmissible without prior warnings. I would not go there.

Mansfield, J., joins this special concurrence.

**APPEL, Justice (concurring in part and dissenting in part).**

I readily concur in the majority's discussion of exigent circumstances. I dissent, however, on the issue of consent to search.

Certainly we all recognize that the home is entitled to special protection under the Fourth Amendment. This special protection of the home has been repeatedly emphasized by the United States Supreme Court and by this court. Protection of the home is wired into the Fourth Amendment; article I, section 8 of the Iowa Constitution; and in the DNA of judges who believe the constitutional provisions regulating search and seizure have meaning.

For instance, in *Boyd v. United States*, 116 U.S. 616, 630, 6 S. Ct. 524, 532, 29 L. Ed. 746, 751 (1886), *abrogated on other grounds by Warden v. Hayden*, 387 U.S. 294, 302, 87 S. Ct. 1642, 1647–48, 18 L. Ed. 2d 782, 789 (1967), the Court emphasized that constitutional search and seizure principles apply

> to all invasions on the part of the government and its employees of the sanctity of a man's home and the privacies of life. It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offense; but it is the invasion of his indefeasible right of personal security, personal liberty, and private property . . . .

And then in *Weeks v. United States*, 232 U.S. 383, 393, 34 S. Ct. 341, 344, 58 L. Ed. 652, 656 (1914), *overruled in part on other grounds by Mapp v. Ohio*, 367 U.S. 643, 654–55, 81 S. Ct. 1684, 1691, 6 L. Ed. 2d 1081, 1089–90 (1961), the court said:

> If letters and private documents [could] . . . be [unlawfully] seized [from a home without a warrant] and used in evidence against a citizen accused of an offense, the protection of the [Fourth] Amendment, declaring his right to be secure against such searches and seizures, is of no value, and . . . might as well be stricken from the Constitution.

Similarly, in *Johnson v. United States*, 333 U.S. 10, 13–14, 68 S. Ct. 367, 369, 92 L. Ed. 436, 440 (1948), the Supreme Court, in Justice Jackson's famous words, declared:

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers.

While the current United States Supreme Court has dramatically scaled back Fourth Amendment protections, it has repeatedly emphasized the sanctity of the home as being at the core of Fourth Amendment protections. For example, in *United States v. Karo*, 468 U.S. 705, 717, 104 S. Ct. 3296, 3304, 82 L. Ed. 2d 530, 542 (1984), the Court held that a search warrant is required when an electronic monitor is placed in a drum outside of the home, but is subsequently carried into the home. In *Payton v. New York*, 445 U.S. 573, 603, 100 S. Ct. 1371, 1388, 63 L. Ed. 2d 639, 661 (1980), the Court held that an arrest warrant is required to enter the home of an occupant. In *Kyllo v. United States*, 533 U.S. 27, 40, 121 S. Ct. 2038, 2046, 150 L. Ed. 2d 94, 106 (2001), the Court held that a warrant is required to use a device not in general public use that measures heat within the home even when there is no physical intrusion.

The sanctity of the home was an underpinning of this court's recent opinion in *State v. Ochoa*, 792 N.W.2d 260 (Iowa 2010). In *Ochoa*, we stated, "The home plays a central role in a person's life, providing

sanctuary, comfort, seclusion, security, and identity." *Ochoa*, 792 N.W.2d at 289. We observed the Iowa framers "clearly endorsed" the notion of the sanctity of the home, and we explained our caselaw has historically "reflected considerable solicitude to the sanctity of the home." *Id.* at 275, 285. We further emphasized that "[i]nvasions of the home by government officials cannot be regarded as constitutionally insignificant." *Id.* at 289.

The need to guard against invasions of the home has been long recognized in the knock-and-talk context. Felix Frankfurter once wrote to Chief Justice Warren in connection with search and seizure law that "[t]o the extent that I am charged, not by you, with being 'a nut' on the subject of the 'knock at the door,' I am ready to plead guilty." Bernard Schwartz, *Super Chief: Earl Warren and His Supreme Court—A Judicial Biography* 266 (1983). Not surprisingly, there is considerable caselaw and academic commentary cautioning about use of the knock-and-talk procedure to evade the warrant requirement ordinarily required before police may search a home.

For example, in *Hayes v. State*, 794 N.E.2d 492, 497 (Ind. Ct. App. 2003), the court noted, "While not per se unlawful, the knock and talk procedure 'pushes the envelope' and can easily be misused." Similarly, in *United States v. Johnson*, 170 F.3d 708, 721 (7th Cir. 1999) (Evans, J., concurring), it was observed that "the seeds of this bad search were sown when the police decided to use the 'knock and talk' technique." Justice Stevens, in his concurring opinion in *Georgia v. Randolph*, 547 U.S. 103, 124, 126 S. Ct. 1515, 1528–29, 164 L. Ed. 2d 208, 228 (2006) (Stevens, J., concurring), suggested that there is a need for a tightened voluntariness standard in connection with knock and talks.

A number of courts have suggested police must have at least reasonable suspicion before a knock-and-talk procedure may be implemented. *See, e.g., United States v. Jones*, 239 F.3d 716, 720–21 (5th Cir. 2001); *United States v. Tobin*, 923 F.2d 1506, 1511 (11th Cir. 1991). Some commentators have suggested the requirement of reasonable suspicion does not go far enough. *See, e.g.*, Craig M. Bradley, *"Knock and Talk" and the Fourth Amendment*, 84 Ind. L.J. 1099, 1117 (2009) [hereinafter Bradley]. Although the issue of reasonable suspicion is not an issue in this case, these authorities cited above demonstrate the sensitivity of courts in considering the invasion of privacy interests inherent in the knock-and-talk procedure.

Academics have cautioned that knock-and-talk methods may render the search warrant requirement nugatory. *See, e.g.*, Bradley, 84 Ind. L.J. at 1099. These commentators often favor a requirement of a knowing and intentional waiver in order to promote the sanctity of the home and defend the ordinary requirements of probable cause and a judicial warrant before a home may be searched. *Id.* at 1127.

With this background, we now turn to the issue of consent in the present case. In *State v. Pals*, 805 N.W.2d 767 (Iowa 2011), this court determined that an automobile search was invalid under article I, section 8 of the Iowa Constitution. We noted weaknesses in the federal court application of *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). *Pals*, 805 N.W.2d at 779–82. While we reserved the issue of whether to adopt a more demanding "knowing and voluntary waiver test" under *Johnson v. Zerbst*, 304 U.S. 458, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938), for another day, we held that any application of a totality-of-the-circumstances test to determine whether consent was voluntary must be done with rigor to promote the constitutional values

underlying article I, section 8. *Pals*, 805 N.W.2d at 782. Although we are confronted with a different factual scenario in this case, applying the more rigorous totality-of-the-circumstances test described in *Pals* leads to the conclusion that the consent in this case should be considered involuntary.

First, I begin with recognition that this case involves a search of the home. One of the abuses that gave rise to the Fourth Amendment was the abuse caused by the King's agents through dragnet searches of homes without probable cause which were purportedly authorized by general warrants and writs of assistance. In light of the history, and the wording of the Fourth Amendment itself, protection of the home from generalized searches not supported by probable cause has long been considered at the core of search and seizure law. *See Johnson*, 333 U.S. at 14, 68 S. Ct. at 369, 92 L. Ed. at 440; *Boyd*, 116 U.S. at 630, 6 S. Ct. at 532, 29 L. Ed. at 751; *see also Kyllo*, 533 U.S. at 40, 121 S. Ct. at 2046, 150 L. Ed. 2d at 106; *Karo*, 468 U.S. at 716–17, 104 S. Ct. at 3304, 82 L. Ed. 2d at 542; *Payton*, 445 U.S. at 603, 100 S. Ct. at 1388, 63 L. Ed. 2d at 661. Our cases recognize the sanctity of the home in the Iowa constitutional tradition as well. *See, e.g.*, *Ochoa*, 792 N.W.2d at 274–75; *State v. Sheridan*, 121 Iowa 164, 167, 96 N.W. 730, 731 (1903). Most recently, in *Ochoa*, we built on earlier state precedent, which noted that "the right of officers to thrust themselves into the home is a matter of 'grave concern.' " *Id.* (quoting *State v. Brant*, 260 Iowa 758, 763, 150 N.W.2d 621, 625 (1967)).

In short, there is ample support for the common sense notion that we should be especially solicitous of the privacy interest in a person's home in considering search and seizure questions under article I, section 8 of the Iowa Constitution. The centrality of the home in search and

seizure law dictates that we engage in a searching analysis before we conclude that the constitutional right to privacy in the home has been waived in the knock-and-talk context. "[T]he closer officers come to intrusion into a dwelling, the greater the constitutional protection." *State v. Ferrier*, 960 P.2d 927, 931 (Wash. 1998) (citation and internal quotation marks omitted); *see also State v. Brown*, 156 S.W.3d 722, 731 (Ark. 2004) (fundamental interest in the home requires that any violation requires strict scrutiny and compelling state interest). Therefore, in the knock-and-talk context we should take seriously the notion that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. U.S. Dist. Ct.*, 407 U.S. 297, 313, 92 S. Ct. 2125, 2134, 32 L. Ed. 2d 752, 764 (1972).

Second, I think it obvious that knock and talks have an element of inherent coercion.[16] I note the admonition of Caleb Foote many years ago that "what on their face are merely words of request take on color from the officer's uniform, badge, gun, and demeanor." Caleb Foote, *The Fourth Amendment: Obstacle or Necessity in the Law of Arrest?*, 51 J. Crim. L. & Criminology 402, 403 (1960). It has more recently been observed that "[i]t is inherently improbable that criminal suspects voluntarily would consent to the discovery of the very evidence necessary to seal their legal demise." Christo Lassiter, *Eliminating Consent from the Lexicon of Traffic Stop Interrogations*, 27 Cap. U. L. Rev. 79, 128 (1998). A police request for consent "however gently phrased, is likely to be taken by even the toughest citizen as a command. Refusal of requested 'permission' is thought by most of us to risk unpleasant, though

---

[16]There is authority for the proposition that the level of inherent coercion in the context of a knock and talk is less than in a traffic stop. *See State v. Domicz*, 907 A.2d 395, 407 (N.J. 2006). This may be true, but while the element of coercion may be somewhat less, the interest in privacy is at its zenith in the home.

unknown, consequences." H. Richard Uviller, *Tempered Zeal: A Columbia Law Professor's Year on the Streets with the New York City Police* 81 (1988).[17] As a result, we have recently said that any application of *Schneckloth* must be made "with teeth" and cannot involve a cursory review of evidence leading to an inevitable conclusion. *See Pals*, 805 N.W.2d at 782; *see also* Adrian J. Barrio, Note, *Rethinking* Schneckloth v. Bustamonte*: Incorporating Obedience Theory into the Supreme Court's Conception of Voluntary Consent*, 1997 U. Ill. L. Rev. 215, 233 (1997).

Third, there is a question regarding a promise of leniency or similar representations. In this case, law enforcement officers represented that they were not interested in the crimes of the homeowner, but only in the health of third parties. This representation is indistinguishable from the representation made in *State v. Howard*, 509 N.W.2d 764 (Iowa 1993). In *Howard*, we held that an officer's statement that "no one was in trouble and that the officer intended only to recover the stolen property" was a sufficient promise of leniency to invalidate consent to search. *Howard*, 509 N.W.2d at 766.

Further, in *State v. Reinier*, 628 N.W.2d 460, 469 (Iowa 2001), a resident signed a written consent form stating that the resident consented to the search, that the consent was "free from duress and coercion," that the party could ask the officers "to stop searching at any time," and that the officers could not make the search of the property except "by legal warrant." Appendix at 56, *State v. Reinier*, 628 N.W.2d 460 (Iowa 2001) (No. 99–1963). Notwithstanding the execution of the consent, the officers' statements that they were not looking for small

---

[17]These authorities are cited in Tracey Maclin, *The Good and Bad News About Consent Searches in the Supreme Court*, 39 McGeorge L. Rev. 27, 28 n.6, 52 n.162 (2008).

quantities of drugs but "meth labs" and "major dealers" were found to bear on the voluntariness of the consent because the statements reflected limitations on the nature of the crime under investigation. We stated in *Reinier* that such statements "subtly create a false belief that no adverse consequences" will result from the search even when the police obtain a written consent to search from the defendant. *Reinier*, 628 N.W.2d at 469. Like *Howard*, our holding and analysis in *Reinier* strongly indicates the consent in this case should not be considered voluntary.

A ruling to the contrary in this case would amount to a departure from our established approach in *Howard* and *Reinier*. Citing *Reinier* with approval, Professor LaFave emphasizes that even a truthful representation that tends to minimize the consequences undermines voluntariness. 4 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 8.2(n), at 140 (4th ed. 2004) [hereinafter LaFave].

Fourth, there was an assertion of authority when the officers directed persons to sit on couches and leave the premises. It may not have technically amounted to a seizure, but nonetheless it appears that police were asserting control of the situation. Police commands in the confines of a home suggest consent may be more a product of acquiescence than a truly voluntary act. This conduct is a factor that tips against voluntariness. *See Randolph*, 547 U.S. at 121, 126 S. Ct. at 1527, 164 L. Ed. 2d at 226–27 (stating where police separate co-occupant for purpose of avoiding possible objections of one of the occupants to the search, the search is invalid). This is precisely what occurred in this case.

Fifth, law enforcement did not advise the resident that she had a right to refuse consent. We discussed this element extensively in *Pals*,

observing a disclosure of the right to decline the search is a very important feature of determining whether there has been an appropriate balance between police authority and the rights of citizens. *See Pals*, 805 N.W.2d at 783. As noted by Justice Stevens in the context of the search of a home, cotenants should be advised that "each of the partners has a constitutional right that he or she may independently assert or waive." *Randolph*, 547 U.S. at 125, 126 S. Ct. at 1529, 164 L. Ed. 2d at 229 (Stevens, J., concurring). While under a *Schneckloth*-type totality-of-the-circumstances test the failure to inform a suspect of the right to refuse consent is not dispositive, I would accord it great weight in the knock-and-talk context. Where the privacy interests are the highest and most intense, a truly voluntary consent to search is less likely than where the invasion of privacy is minimal. Stated in other words, ignorant consent does not seem likely to be truly voluntary when uniformed police arrive at the home and seek to search highly private areas.[18]

In this regard, it is important to further note that the repetitive refusal to consent is an aggravating factor.[19] 4 LaFave § 8.2(f), at 98 (stating it would seem that a suspect's earlier refusal to give consent is a factor which is properly taken into account as part of the totality of circumstances in judging the later consent). At least one commentator has suggested that once a person declines consent to a search, a rule similar to that in *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S. Ct. 1880, 1885, 68 L. Ed. 2d 378, 386 (1981), should apply, namely, that

---

[18]For exploration of the concept of ignorant consent, see Morgan Cloud, *Ignorance and Democracy*, 39 Tex. Tech. L. Rev. 1143 (2007).

[19]Oddly, the special concurrence turns this factor on its head, suggesting that because Audsley at first refused, her later consent is voluntary. The message of the special concurrence is that repeated police pressure on a resident after he or she refuses consent, which ultimately overcomes his or her resistance, produces a valid search.

police must scrupulously honor the request in order to avoid implicit coercion incompatible with Fourth Amendment principles. Tracey Maclin, *The Good and Bad News About Consent Searches in the Supreme Court*, 39 McGeorge L. Rev. 27, 80–81 (2008).

Under the circumstances, namely, a search of a home, the lack of a clear statement of the right to refuse consent, statements limiting the purpose of the search, and the repeated refusal to consent to search, I would hold the search is involuntary under article I, section 8 of the Iowa Constitution. As noted in *Reinier*:

> Police can request consent to enter and search a home in the course of investigating a complaint without intimidation, implied authority, or minimizing the consequences. We think the fair accommodation between the interest in effective law enforcement and our fundamental belief in fair law enforcement procedures requires this conclusion.

*Reinier*, 628 N.W.2d at 469.

The cases try to put a degree of structure on the determination of voluntariness, and I think that *Howard, Reinier,* and *Randolph,* collectively require a finding of involuntariness. If we do not utilize this caselaw to structure the analysis, we are left with a wide open, totality-of-the-circumstances test in which the seven members of this court, in essence, sit as a jury to weigh whether the consent was really a voluntary one or whether it was directly or indirectly coerced. Our caselaw, of course, has long recognized that atmospherics play an important role in that determination. We seek a realistic, and not a formal, assessment of the totality of circumstances. In my view, the majority does not give proper recognition to the notion that the consent exception to the warrant requirement is a " 'jealously and carefully drawn' " exception. *Randolph,* 547 U.S. at 109, 126 S. Ct. at 1520, 164 L. Ed. 2d at 219

(quoting *Jones v. United States*, 357 U.S. 493, 499, 78 S. Ct. 1253, 1257, 2 L. Ed. 2d 1514, 1519 (1958)).

Yet, it is not at all surprising, and indeed, it is completely to be expected, that members of this court, like members of a jury, would have different views in many cases. Specifically, the majority believes the record shows that the resident had knowledge of her right to decline the request to search and that the environment was not sufficiently coercive to invalidate the search. For the reasons already stated, I see the situation much differently.

In *Pals*, we declined to reach the question of whether we should abandon a *Schneckloth*-type voluntariness test in favor of the knowing and voluntary waiver test in *Zerbst*. *Pals*, 805 N.W.2d at 782. It was unnecessary in *Pals* to reach the larger issue as the court determined a narrower ground was sufficient to decide the issues at hand. *Id.*

While deciding an issue on narrow grounds is generally sound, this case demonstrates that a *Schneckloth*-type voluntariness test, even one "with teeth," does not yield completely satisfactory results. As a leading authority has noted in the context of *Schneckloth*, "[I]t can seldom be said with confidence that a particular combination of factors will inevitably ensure a finding of either consent or no consent" because of the difficulty in applying the multifactored voluntariness test. 4 LaFave § 8.2, at 53–54. The spongy nature of the *Schneckloth* voluntariness test has not escaped the courts, where it has been noted that courts can be bogged down in "needless suppression motions, hearings, and appeals." *Hayes v. State*, 794 N.E.2d 492, 497–98 (Ind. Ct. App. 2003).[20]

---

[20]According to a leading Fourth Amendment treatise, the Supreme Court's treatment of consent in *Schneckloth* "generates almost universal criticism from commentators." *See* Thomas K. Clancy, *The Fourth Amendment: Its History and Interpretation* § 10.4.1, at 418 (2008) (citing numerous law review commentaries).

There have been several judicial reactions to the inherent instability of *Schneckloth*-type totality-of-the-circumstances review. One, as noted by Professor Weinreb, has been for courts to simply "provide a lengthy factual description followed by a conclusion . . . without anything to connect the two." Lloyd L. Weinreb, *Generalities of the Fourth Amendment*, 42 U. Chi. L. Rev. 47, 57 (1974). Another approach is to give lip service to the open-ended totality-of-the-circumstances test in *Schneckloth*, but instead focus on something else, such as the wording of the request (was it a question or a demand) or upon police misconduct. *See* William J. Stuntz, *Privacy's Problem and the Law of Criminal Procedure*, 93 Mich. L. Rev. 1016, 1064 (1995) (stating that the consent issue often turns on whether police frame command as a question or a demand); Brian A. Sutherland, Note, *Whether Consent to Search Was Given Voluntarily: A Statistical Analysis of Factors That Predict the Suppression Rulings of the Federal District Courts*, 81 N.Y.U. L. Rev. 2192, 2195 (2006) (finding that police misconduct rather than voluntariness factors is most predictive of outcomes). Even these reformulated shortcuts are not always consistently applied, with the end result that there is considerable instability in the caselaw, with nuances and hairsplitting ultimately deciding the cases. *See generally* Fern L. Kletter, Annotation, *Construction and Application of Rule Permitting Knock and Talk Visits Under Fourth Amendment and State Constitutions*, 15 A.L.R. 6th 515 (2006) (citing hundreds of cases with differing results).

In light of the difficulties of applying a multifactored test, a number of states have adopted the view that in the knock-and-talk setting, police must first advise a resident of his or her right to refuse consent before consent may be considered voluntary. *See, e.g., State v. Brown*, 156 S.W.3d 722, 732 (Ark. 2004); *Graves v. State*, 708 So. 2d 858, 864 (Miss.

1997); *State v. Johnson,* 346 A.2d 66, 68 (N.J. 1975); *State v. Ferrier,* 960 P.2d 927, 932–33 (Wash. 1998).[21] These cases generally find that knock-and-talk procedures carry with them a degree of coercion; that the home is entitled to special Fourth Amendment protection; and that as a result, a resident must be advised that they may lawfully refuse to give consent.

It is sometimes claimed that advising a person of the right to refuse consent would deprive police of an effective law enforcement tool. Indeed, *Schneckloth* itself states that a requirement of a warning would "create serious doubt whether consent searches could continue to be conducted." *Schneckloth,* 412 U.S. at 229, 93 S. Ct. at 2049, 36 L. Ed. 2d at 864. Such an assertion is logically flawed and factually incorrect.

First, the effective law enforcement argument proves too much. If depriving police of a tool that produces evidence is the standard, the search and seizure provisions of article I, section 8 of the Iowa Constitution would never be enforced and it would be effectively

---

[21]There are now literally thousands of decisions where state supreme courts have interpreted state constitutions to grant claims of individual rights and liberties under circumstances where the United States Supreme Court has declined to do so. *See* 1 Jennifer Friesen, *State Constitutional Law: Litigating Individual Rights, Claims, and Defenses* § 1.01[1], at 1-2 (4th ed. 2006); *see generally* Robert F. Williams, *The Law of American State Constitutions* (2009) [hereinafter Williams]. The principle of independent interpretation applies when state and federal constitutional provisions are identical or nearly identical. *See State v. Ochoa,* 792 N.W.2d 260, 264–66 (Iowa 2010) (generally discussing independent state law grounds, including when provisions of state and federal constitution are identical in language); *State v. Cline,* 617 N.W.2d 277, 284–85 (Iowa 2000) (stating "no principle of law requires this court to interpret the Iowa Constitution in line with the United States Constitution"), *abrogated on other grounds by State v. Turner,* 630 N.W.2d 601, 606 n.2 (Iowa 2001); *see also State v. Christensen,* 953 P.2d 583, 586 (Idaho 1998) ("Long gone are the days when state courts will blindly apply United States Supreme Court interpretation and methodology" even under nearly identically worded constitutional provisions) (citation and internal quotation marks omitted); *Davenport v. Garcia,* 834 S.W.2d 4, 20 (Tex. 1992) (stating state courts should borrow from well-reasoned and persuasive precedent when "deemed helpful, but should never feel compelled to parrot the federal judiciary"); Williams at 135 (stating the notion that United States Supreme Court precedents are presumptively correct under state law is "simply wrong").

repealed. As noted by the United States Supreme Court in the context of federal search and seizure law, "[T]he mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 393, 98 S. Ct. 2408, 2414, 57 L. Ed. 2d 290, 301 (1978). The same is true under article I, section 8 of the Iowa Constitution.

Further, the notion that effective law enforcement rests upon citizen ignorance is not a principle that should be relied upon in a democratic state based on the rule of law. While justice should be blind to irrelevancies when weighing the evidence in the courtroom, citizens facing searches of their homes are entitled to have their eyes open. Justice Goldberg got it right fifty years ago in *Escobedo v. Illinois*, 378 U.S. 478, 490, 84 S. Ct. 1758, 1764, 12 L. Ed. 2d 977, 985 (1964), when he wrote, "We have also learned the companion lesson of history that no system of criminal justice can, or should, survive if it comes to depend for its continued effectiveness on the citizens' abdication through unawareness of their constitutional rights." *See also* James A. Adams, *Search and Seizure As Seen by Supreme Court Justices: Are They Serious or Is This Just Judicial Humor?*, 12 St. Louis U. Pub. L. Rev. 413, 449 (1993) [hereinafter Adams] (stating "constitutional rights are not to be hidden or only grudgingly given").

In any event, the available empirical evidence is that requiring knowledge of the right to refuse consent does not dramatically reduce the number of consent searches. Empirical data from Ohio and New Jersey demonstrate that requiring warnings in the context of automobile searches only marginally decreases consent to search. *See* Illya Lichtenberg, Miranda *in Ohio: The Effects of* Robinette *on the "Voluntary" Waiver of Fourth Amendment Rights*, 44 How. L.J. 349, 370 (2001)

(stating warnings reduced consent to search by motorists by less than ten percent).

The *Schneckloth* Court also declared that it would be "impractical" to provide warnings in the give and take of police encounters with citizens. Professor Adams declared such an argument "absurd." Adams, 12 St. Louis L. Rev. at 447. Subsequent events have vindicated his position. California and New Jersey have agreed to settlements of lawsuits which require written warnings for motorists when officers seek consent to search. The FBI has used written consents that advise citizens of their right to refuse consent since the time of *Schneckloth*, and the caselaw across the country demonstrates that law enforcement officers commonly seek written consent to search. *See, e.g.*, *United States v. Boone*, 245 F.3d 352, 362 (4th Cir. 2001); *United States v. Maez*, 872 F.2d 1444, 1453–54 (10th Cir. 1989); *United States v. Tatman*, 615 F. Supp. 2d 664, 670 (S.D. Ohio 2008); *State v. Brown,* 156 S.W.3d 722, 724–25 (Ark. 2004).

Indeed, law enforcement authorities in Iowa are no different than those in other states when it comes to written consent to search. Our caselaw shows that written consent forms that advise a party of his right to refuse consent are practical and in use in Iowa. *See State v. Howard*, 509 N.W.2d 764 (Iowa 1993); *State v. Dougherty*, No. 09–0812, 2011 WL 441551, at *2 (Iowa Ct. App. Feb. 9, 2011); *State v. DeWitt*, No. 02–1379, 2003 WL 22805617, at *2 (Iowa Ct. App. Nov. 26, 2003). And, in this case, law enforcement officers properly recorded the encounter, thereby eliminating the "he said, she said" swearing match.[22] Whatever else

---

[22]Affordable technology now allows interrogations, citizen encounters, and identification procedures such as lineups to be recorded. Such recordings reduce the potential for factual disputes and promote adherence to professional law enforcement practices.

might be true, obtaining written consents that contain appropriate brief statements advising citizens of the right to refuse consent is not impractical at all.

Indeed, our precedents are strongly pushing in the direction of cleaning up *Schneckloth.* In *Welch v. Iowa Department of Transportation*, 801 N.W.2d 590 (Iowa 2011), this court considered whether a driver could change his mind after he refused to consent to a chemical testing under Iowa's implied consent law. We held that a driver could not change his mind once he refused. We stated:

> [A] bright-line rule has the advantage of providing clear guidance to law enforcement personnel. Clarity as to what the law requires is generally a good thing. It is especially beneficial when the law governs interactions between the police and citizens.

*Welch*, 801 N.W.2d at 601. This powerful language cuts dead against continued application of the totality-of-the-circumstances test of *Schneckloth.*

We can continue to employ a multifactored test for determining consent issues under article I, section 8. We have improved on this test considerably by applying a more rigorous review than under federal precedents. Yet, the totality-of-the-circumstances test of *Schneckloth* is inherently unstable.

As a result, I am convinced that it would be better simply to require that law enforcement advise a homeowner or resident of his or her constitutional right to decline to consent to a search. This would provide a much clearer rule for law enforcement and citizens alike. *See Welch*, 801 N.W.2d at 601. When the homeowner or resident is advised of his or her right to consent, a presumption would arise that the warnings are voluntary. On the other hand, the failure of police to

provide such a warning would result in reversal. Such an approach is consistent with constitutional values, provides a more workable rule for law enforcement, and ensures that citizens are aware of their constitutional rights before surrendering them.[23]

In evaluating this case, we must ensure that our approach to article I, section 8 does not establish a framework where constitutional protection "fades away and disappears." *Coolidge v. New Hampshire*, 403 U.S. 443, 461, 91 S. Ct. 2022, 2035, 29 L. Ed. 2d 564, 580 (1971). A knock-and-talk process whereby police seek consent to search a home raises substantial privacy issues under article I, section 8 of the Iowa Constitution. Under a rigorous application of a *Schneckloth*-type totality-of-the-circumstances approach, the consent in this case is invalid. In the alternative, we should abandon the totality-of-the-circumstances test of *Schneckloth* altogether and adopt a requirement that a citizen must be advised of his or her right to refuse consent before a knock-and-talk search is valid. Such an approach is more stable than other alternatives; provides a brighter line for law enforcement and citizens alike; is more consistent with the values underlying article I, section 8; and would be a significant improvement in our search and seizure law.

In any event, this case, decided by a four to three vote, has a clear practical message. When law enforcement does not advise a homeowner or resident of their right to refuse consent, a subsequent search might

---

[23]In this case, Lowe did not brief the issue of whether *Schneckloth* should be abandoned and replaced by a mandatory warning or with a *Zerbst*-type test. The majority thus declines to consider whether we should abandon *Schneckloth* under either theory. Unlike the majority, I regard the issue as sufficiently intertwined to allow the court to address the issue. *See Feld v. Borkowski*, 790 N.W.2d 72, 84 (Iowa 2010) (Appel, J., concurring in part and dissenting in part). In any event, it is critically important that the court not establish a pattern of narrowly viewing issues in order to defeat assertions of individual rights and then of broadly viewing issues in order to uphold the actions of the state or business actors against claims of individuals.

well be found invalid under the difficult to apply totality-of-the-circumstances *Schneckloth* test as applied by this court under article I, section 8 of the Iowa Constitution. Law enforcement will increase the likelihood that a search of the home will be found "free and voluntary," even under the current test, by advising home owners or residents of their right to refuse.

Wiggins and Hecht, JJ., join this concurrence in part and dissent in part.